In the Matter of the Estate of HERBERT K. WALTON, Also Known as HERBERT KRAFT WALTON, SR., Deceased. NICHOLAS R. DOMAN, as Executor of KATHERINE R. WALTON, Deceased, et al., Appellants; CHASE MANHATTAN BANK (NATIONAL ASSOCIATION), as Executor of HERBERT K. WALTON, Deceased, et al., Respondents.

First Department, March 24, 1977

*William T. Livingston, III,* of counsel *(Nicholas R. Doman, pro se,* attorney), for Nicholas R. Doman, appellant.

*Joseph Katz* of counsel *(Botein, Hays, Sklar & Herzberg,* attorneys), for American Cancer Society, New York City Division, Inc., appellant.

*Martin L. Lepelstat* of counsel *(Carlyn S. McCaffrey* with him on the brief; *Weil, Gotshal & Manges,* attorneys), for American National Red Cross, appellant.

*John H. Frey* of counsel *(Christy, Frey & Christy,* attorneys), for New York Heart Association, Inc. and another, appellants.

*Robert R. Molic* of counsel *(Samuel A. Hirshowitz* with him on the brief; *Louis J. Lefkowitz, Attorney-General* for ultimate charitable beneficiaries, appellants.

*Charles F. Murphy,* guardian ad litem for Elizabeth Walton and another, respondents.

*Tomás L. Ryan* of counsel *(Ryan & Ryan,* attorneys), for Chase Manhattan Bank (National Association), respondent.

STEVENS, P. J. Respondents-appellants (appellants), a group which includes the widow of the decedent,[1] the Attorney-General of the State of New York, an educational institution and several named charitable organizations, separately appeal from a decree of the Surrogate's Court, New York County (DI FALCO, S.) entered April 1, 1976, which determined the validity and effect of the widow's election to take an elective share of the decedent's estate and also determined that an *inter vivos* trust created in 1958 and thereafter amended, satisfies her right of election except to the extent of $10,000.

This proceeding was instituted by the Chase Manhattan Bank, National Association (hereinafter Chase Manhattan), as executor of decedent's estate and trustee of an *inter vivos* trust established by the decedent in 1958, to determine the validity of a right of election filed by the widow to take a share of the estate against the provisions of the will under which she takes nothing.

In the trust agreement dated May 27, 1958, decedent established an *inter vivos* trust and transferred and delivered certain personal property to the trustees for the uses and purposes set forth in the agreement. In article "Second" of the agreement, decedent as settlor reserved to himself the right to revoke or change the trust at any time without the consent of anyone or even without notice except to the corporate trustee, Chase Manhattan, "PROVIDED HOWEVER, that the terms of this agreement may not be changed in such manner as (a) to reduce in any way the provision made for the lifetime of the Settlor's wife, Katherine Rose Kane Walton, in section A of Article First of this agreement except with her consent in writing or (b) to increase the obligations of the Corporate Trustee or to alter the rates of the commissions of the Corporate Trustee without its written consent." Chase Manhattan

---

1. Subsequent to the argument and submission of this appeal, respondent-appellant, Katherine Rose Kane Walton, died and determination of this appeal was withheld pending substitution of a personal representative for the decedent. By order dated February 25, 1977 (SPIEGEL, S.), Nicholas R. Doman was substituted as executor of the goods, chattels and credits of Katherine Rose Kane Walton, deceased, as a respondent in this proceeding in place and stead of said decedent.

was also authorized under section B to invade the principal and to make payments, with the wife's consent, to decedent during his lifetime for certain designated purposes. Section A of article First also provided that the trust income should be paid to the decedent for life and at his death to his widow, with a power of appointment by will vested in the widow, subject to certain limitations. In default of the exercise of such power, the principal of the trust was to be paid over to the American Red Cross.

It may be noted that at the time of the creation of the trust decedent was married to another. Decedent and the present widow were married April 12, 1961.

On May 22, 1961, the decedent amended the trust agreement without his wife's consent so as to effect a change in the designated charitable remainder beneficiaries in the event of a default by the widow in the power of appointment.

On February 15, 1963, the decedent again amended the trust agreement, this time with the wife's consent and significant and far-reaching changes were made. The income was still to be paid to or used for the benefit of the decedent during his lifetime, and after his death to be paid to his widow or used for her benefit during her lifetime. However, the amendment added a new section C to article First which provided that upon the decedent's death, $100,000 was to be paid or "poured over" from the principal of the trust and become a part of decedent's residuary estate. In addition, a sum equal to all inheritance, estate and succession taxes on decedent's taxable estate, whether passing under the agreement or by last will, was to be paid over from the principal of the trust estate to the decedent's executors or administrators and become part of his residuary estate. Provision was made for a trust fund A in order to qualify for the marital deduction, and for a trust fund B for the maximum charitable deduction. These deductions, to some extent, would offset the "pour-over" provisions. Upon decedent's death, the income of both trusts was to be paid to the widow for life. The trust principal would be reduced by the amounts heretofore indicated.

On May 12, 1971, decedent sought to amend the trust agreement without his wife's consent, striking the provisions for trust funds A and B and other provisions which would have made possible the qualification for the marital deduction and the charitable deduction. The wife's testamentary power

of appointment and Chase Manhattan's power to invade the principal for the wife's benefit were eliminated, and the trust corpus was to be paid over to the decedent's executors and become a part of his estate on the death of the survivor of decedent and his wife. The estate tax provision and the $100,000 "pour-over" provisions remained. It also revoked the appointment of his wife as substitute trustee in place of decedent. By a further amendment dated January 7, 1972, again without the wife's consent, Chase Manhattan was given the power to borrow money from itself.

On May 12, 1971, decedent also executed a last will and testament in which his wife was not named as a beneficiary. Decedent died November 16, 1972, and subsequently, his widow sought to exercise her right of election to take against the will. Chase Manhattan rejected the widow's notice of election on the ground that its validity should be judicially determined as well as the effect and extent of such election.

The Surrogate held valid the widow's exercise of her right of election, the amendments to the trust indenture dated May 22, 1961, and Feburary 15, 1963, and determined that the 1971 and 1972 amendments were such substantial and material changes as to be considered a new trust agreement.

Of the May 12, 1971 amendment, the Surrogate stated, "It was not 'a mere formal change' in the 1958 trust agreement." In effect, it transformed the 1958 trust agreement into a testamentary substitute, which satisfied the widow's recognized right of election in all respects except as to $10,000 which was to be deducted from the principal of the trust (EPTL 5-1.1, subd [c], par [1], cl [c]).

The question on appeal is whether the 1971 and 1972 amendments were valid, and, if so, did the trust agreement become a testamentary substitute so as to be included in the testamentary estate of the decedent. We agree that the widow had a right of election against the will. The problem is to determine the breadth, scope and effect of her exercise of that right.

When the trust was created in 1958, though the parties were not then married, the decedent reserved the right to revoke the trust in whole or in part without anyone's consent required. A limitation of that right was that no change could be made which reduced the provision for Katherine Rose Kane Walton for her lifetime in section A of article First without her written consent. While the amendment of May

22, 1961, was without her consent, it chiefly amended as to the ultimate charitable remaindermen. Since the February 15, 1963 amendment was made with the written consent of the decedent's wife, such consent served not only to validate the substantial changes made in the trust agreement in 1963, but the prior 1961 amendment as well.

As the agreement then stood, the decedent's wife was entitled to a life income, with a power in Chase Manhattan to invade the principal for her benefit should it deem it necessary. She was clearly a person beneficially interested in the trust whose written consent was necessary to revoke or amend the trust (EPTL 7-1.9; see, also, *Matter of Dodge,* 25 NY2d 273) except as the settlor had reversed the power to revoke or amend. Additionally, the 1963 amendment made possible the securing of the maximum marital deduction as well as charitable deductions for that portion of the estate left to charity. The decedent's apparent purpose in these amendments was the reduction of estate taxes. It also seems clear that the provision for a "pour-over" of $100,000 from the trust principal and its invasion and reduction by an amount required to pay certain enumerated taxes reduced the life income payable to Mrs. Walton. However, this reduction was offset to some extent by the provisions dealing with marital and charitable deductions and the wife's 1963 consent must be viewed in this context. Despite all the changes, the agreement retained the provision which required the written consent of the wife to any amendment which would have the effect of reducing provisions already made for her lifetime in section A of article First.

As noted, the May 12, 1971 amendments concededly made without the wife's written consent, *inter alia* eliminated the marital and charitable deductions for estate tax purposes, the wife's testamentary power of appointment, and the power of the corporate trustee to invade the principal for the benefit of the wife.

At its inception, it was recognized that the trust principal might vary. In addition to the trust assets initially delivered, the trustees agreed "to accept any cash, securities or other property acceptable to them which the settlor may hereafter transfer or deliver."

Despite changes affecting the principal of the trust, the provision that the decedent's wife should receive the income from the trust for life remained unchanged. And, while the

amendments of 1971 and 1972 eliminated the possible balancing offsets of the 1963 amendments, at decedent's death the trust principal remained substantial and the income thereof sufficient to achieve the settlor's objective. There was a single, fixed invasion of the trust upon the settlor's death to which the wife consented and which merely defined the amount of the principal of the trust as of decedent's death from which she should receive a lifetime income and such act should not be considered potentially destructive of the trust (see *Matter of Plimack,* 72 Misc 2d 476). The 1971 and 1972 amendments did not further deplete the trust principal, but affected the ultimate disposition of the trust assets. Therefore, since the major 1963 change which affected the life income was consented to, and since the right of decedent's wife to a life income from the trust continued, the 1971 and 1972 amendments are deemed valid.

EPTL 5-1.1 (subd [b], par [1]) sets forth the criteria for treating *inter vivos* dispositions as testamentary substitutes for the purpose of election by a surviving spouse. As enumerated by the Surrogate, they are: "(1) the decedent's will had to be executed after August 31, 1966; [in the instant case the will was executed May 12, 1971]; (2) the 'testamentary substitute' had to be effected after August 31, 1966 [here the trust was established in 1958 and amended substantially in 1963, and again in 1971 and 1972]; and (3) the testamentary substitute had to be effected during marriage [which is the case herein]". Unless the later amendments of 1971 and 1972 are found to have effected material changes in the trust agreement, they cannot meet the test required for an *inter vivos* disposition to be considered a testamentary substitute. (See *Matter of Agioritis,* 40 NY2d 646.) Clearly, the 1971 amendment was more than a mere formal change. It eliminated the possibility of the marital and charitable deductions and left a directed reduction of the trust principal plus the additional obligations of full payment of taxes. This was a substantial change, as was the 1972 amendment which gave additional power to the trustees and provided that, upon the death of the wife, the trust principal was to be paid over to the decedent's executors as part of his estate. It must be also remembered that at the time of his death and prior thereto, the decedent retained the power to invade the trust or alter the instrument as he saw fit subject only to the certain limitation regarding changes affecting his wife.

Thus, under the conditions here present, the *inter vivos* trust, as amended, was properly considered a testamentary substitute and the inclusion of the trust assets in decedent's estate is proper. The widow benefits pursuant to the indenture and also pursuant to the right of election. As the Surrogate pointed out "The *inter vivos* trust is greater in amount than the widow's elective share. Under its provisions the widow will receive the income for her life. Accordingly, under the express language of the statute, the widow had only the limited right to take the sum of ten thousand dollars absolutely which shall be deducted from the principal of such trust (EPTL 5-1.1 [c] [1] [D])." We agree. (See, also, EPTL 5-1.1, subd [b], par [1], cl [C] and 5-1.1, subd [c], par [1], cl [F]; *Matter of McGrattan,* 76 Misc 2d 873.)

Finally, this proceeding involves the validity and the extent of the widow's right of election, not the construction of a will, and on the present record, the award of $10,000 to the guardian ad litem is excessive.

Accordingly, the award to the guardian ad litem should be modified, on the law, on the facts and in the exercise of discretion, to reduce the amount to $5,000 and, as so modified, the decree should otherwise be affirmed, without costs.

SILVERMAN, J. (concurring). I agree with the opinion of Presiding Justice STEVENS.

The following observations are perhaps not entirely repetitious.

I. The amendments of 1971 and 1972 are valid because they are within the settlor's reserved power to amend. The settlor reserved to himself a general power to revoke or amend excepting amendment "to reduce in any way the provision made for the lifetime of the Settlor's wife, Katherine Rose Kane Walton, in Section A of article First of this agreement except with her consent in writing". The restriction is only with respect to reducing provision made "for the lifetime of the Settlor's wife" in "Section A of Article First." Section A of article First provided for *income* to Katherine during her life after the settlor's death.

The amendments of 1971 and 1972 did not amend section A. Neither did they amend "the provision made for the lifetime of the Settlor's wife Katherine" (which is all contained in section A). Instead, the amendments essentially changed the

provisions of section *C* for disposition of the *principal* of the trust after Katherine's death.

Appellants argue that because these changed dispositions of principal resulted in a higher estate tax, the principal of the trusts was reduced and therefore the income could be expected to be less. But this is much too indirect a result to qualify as a reduction of "the provision made for the lifetime of the Settlor's wife Katherine \* \* \* in Section A of Article First." It is difficult to accept that to protect his wife Katherine's income during her life, the quoted restriction on the settlor's power of amendment must prevent the settlor from providing for his son and grandchildren out of the remainder after Katherine's death and compel him to leave that remainder to charities.

II. For the purposes of a surviving spouse's right of election: (a) the capital value of a "testamentary substitute," as defined in the statute, is included in the net estate subject to the spouse's elective right (EPTL 5-1.1, subd [b], par [1]). (b) The "testamentary substitute" is a "testamentary provision" (EPTL 5-1.1, subd [c], par [1], cl [C] and is to be credited against or in satisfaction of the spouse's right of election, with, however, the right to receive $10,000 absolutely (EPTL 5-1.1, subd [c], par [1], cls [D] and [F]).

III. The trust is a "testamentary substitute" within the meaning of EPTL 5-1.1 (subd [b], par [1], cl [E]). Except for its date, it falls within the statutory definition: "(E) Any disposition of property made by the decedent after August thirty-first, nineteen hundred sixty-six, in trust or otherwise, to the extent that the decedent at the date of his death retained, either alone or in conjunction with another person, by the express provisions of the disposing instrument, a power to revoke such disposition or a power to consume, invade or dispose of the principal thereof."

The valid amendments of 1971 and 1972 make the trust the equivalent of an *inter vivos* disposition after August 31, 1966, the critical date in the statute. *(Matter of McGrattan,* 76 Misc 2d 873, 876 [1974]; *Matter of Simeone,* 141 Misc 737, 747 [1931].)

There is nothing retroactive about such an interpretation and holding. We are talking about a right to elect to take against a 1971 will. A 1966 statute could make any provision whatsoever as to such a right, as against a will thereafter executed; it could constitutionally say that there should be no

right of election against a future will; it could constitutionally say that there should be such a right of election but that certain transfers—or even transfers antedating the statute— should be credited against that right of election.

Subdivision I of section C of article First of the 1963 amendment to the trust provides for a pour-over of $100,000 into the testator's estate plus the payment of an amount equal to all estate, etc., taxes. In my view, this is not a provision for the reduction of the trust by invasion of the principal for another person or for the termination of the trust prior to the surviving spouse's death by payment of the principal to another person, or a provision for applying less than substantially all of the net income from the trust for the benefit of the surviving spouse within the meaning of EPTL 5-1.1 (subd [c], par [1], cl [J]). (Such provisions would permit the surviving spouse to claim the principal rather than just the income of the trust.) But this case is in substance a provision that on the settlor's death there shall be created a trust equal to essentially all of the settlor's assets, less estate taxes (i.e., the net estate) less $100,000 and that the wife shall receive all the income from that trust for her life. That is a trust of more than the elective share—one third of the net estate. (EPTL 5-1.1, subd [c], par [1], cl [B].)

IV. The result we reach is by no means unjust. The trust contains about 94.6% (reduced to say 75% by the pour-over provision) of the combined assets of the trust and the probate estate. What the widow asked is to keep the benefits under the 75% and get an election out of the remaining 25%. The statute was intended to protect surviving spouses so that they would get at a minimum the income from one third of the principal of the estate for life. It was not intended to give a widow the income from 75% of the assets plus the principal of one third of the remaining 25%. Under the interpretation which we are adopting, the widow was entitled to the income from approximately 75% of the net estate.

KUPFERMAN, MARKEWICH and LYNCH, JJ., concur with STEVENS, P. J.; SILVERMAN, J., concurs in an opinion.

Decree, Surrogate's Court, New York County, entered on April 1, 1976, unanimously modified, on the law and on the facts and in the exercise of discretion, so as to reduce the award to the guardian ad litem to $5,000 and, as so modified, affirmed, without costs and without disbursements.